**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

THOMAS SLIVIENSKI,

Petitioner,

- v -

9:23-CV-1127 (ECC/DJS)

SUPERINTENDENT, ELMIRA CORRECTIONAL FACILITY,[1]

Respondent.

**APPEARANCES:** **OF COUNSEL:**

THOMAS SLIVIENSKI
Plaintiff, *Pro Se*
19-A-4288
Elmira Correctional Facility
P.O. Box 500
Elmira, NY 14902

HON. LETITIA JAMES
Attorney General for the State of New York
Attorney for Respondent
28 Liberty Street
New York, New York 10005

PAUL B. LYONS, ESQ.
Senior Assistant Attorney General

**DANIEL J. STEWART**
**United States Magistrate Judge**

[1] Since filing the Petition, Petitioner has been transferred to Elmira Correctional Facility. The Clerk is directed to update the Court docket to name the Superintendent of Elmira Correctional Facility as Respondent since "the proper respondent in a habeas corpus petition is the officer having custody of the applicant." *Perich v. Mazzuca*, 2007 WL 2455136, at *1 (E.D.N.Y. Aug. 23, 2007) (citing Rule 2(a) of the Rules Governing Section 2254 Cases in the United States District Courts).

**REPORT-RECOMMENDATION and ORDER**[2]

On September 27, 2019, Petitioner was convicted, after a trial, of Murder in the Second Degree and Criminal Possession of a Weapon in the Second Degree. Dkt. No. 1, Petition ("Pet.") at ¶¶ 2, 3, 5. He was then sentenced to twenty years to life in prison for the Murder charge, and fifteen years for the Possession of a Weapon charge, to run concurrently. *Id.*; Dkt. No. 17-1–17-3, State Court Record ("SR") at pp. 9-10.[3] Petitioner presently seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. *See generally* Pet. The Petition asserts the following grounds for relief:

A) The admission of Petitioner's statements to the police violated his *Miranda* rights;

B) Petitioner's IP address from TextNow Inc. ("TextNow") was illegally obtained and all information derived from it should have been suppressed;

C) The Trial Court's decision to allow the TextNow representative to testify remotely violated the Confrontation Clause of the Constitution;

D) Petitioner was denied a fair trial by the admission of evidence of his possession and use of the alleged murder weapon months before the event, as well as the admission at trial of his Snapchat username "Hitsquadbrim";

---

[2] This matter was referred to the undersigned for a report-recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[3] The state court record was filed as eight separate documents. Dkt. Nos. 17-1–17-8. The State Court Records were filed in three volumes at Dkt. Nos. 17-1–17-3, and citations thereto are in the form "SR" followed by the page number provided by Respondent. The State Court Transcripts were filed in five volumes at Dkt. Nos. 17-4–17-8. Dkt. Nos. 17-4–17-7 include portions of jury selection. The trial testimony itself is contained exclusively in Dkt. Nos. 17-7–17-8, and citations thereto are in the form "TT" followed by the page number provided on the transcript.

E) The People committed a *Brady* violation by not disclosing that the People's ballistic expert had been involved in an accident prior to her trial testimony;

F) The verdict was not supported by legally sufficient evidence and was against the weight of the evidence; and

G) The Petitioner's counsel was constitutionally ineffective.

*Id.* at pp. 17-22.

Respondent opposes the Petition. Dkt. No. 16, Resp.'s Mem. of Law. The Petitioner did not file a reply. For the reasons that follow, this Court recommends that the Petition be **denied**.

## I. BACKGROUND

On November 16, 2018, Johni Dunia was shot to death during an attempted drug sale near a bike path located in Cohoes, New York. SR at p. 11, 366-68, 602-03. Petitioner denied his involvement in any shooting and maintained that he was not near the Cohoes bike path at the time of the event. SR at pp. 14-16. Despite that, Petitioner was arrested and charged on November 21, 2018. SR at p. 33; Dkt. Nos. 17-4–17-8, Trial Transcript ("TT") at pp. 463-79. Thereafter, an Albany County Grand Jury indicted Petitioner. SR at pp. 11-12. Petitioner was convicted after trial with Murder in the Second Degree, and Criminal Possession of a Weapon in the Second Degree. SR at pp. 7, 9-10. Petitioner was sentenced to twenty years to life for the murder charge, with a separate sentence of fifteen years for the gun charge which the sentencing court directed to run concurrently with the murder sentence. SR at p. 9. Petitioner's conviction was upheld on appeal to the Appellate Division, Third Judicial Department

in a comprehensive and detailed opinion. *People v. Slivienski*, 204 A.D.3d 1228 (3d Dep't 2022). The New York State Court of Appeals denied review on July 21, 2022. *People v. Slivienski*, 38 N.Y.3d 1136 (2022). This Petition followed.

The following statement of facts is taken from the trial transcript and related documents.

### A. The Shooting

Five friends, Johni Dunia, John Gomez, Jeffrey Shumway, Marquise Alston, and Bryce Carpenter, all attended a baby shower in Cohoes on the day of the shooting. TT at pp. 50-60. After they left, Dunia then made arrangements to purchase marijuana from an individual that he connected with on Snapchat whose username was "Kyree Irving." *Id.* According to his friends, Dunia's intent was to rob "Irving" by obtaining the marijuana without paying for it, a scheme that Dunia had previously engaged in twelve to fifteen times and called "staining" or "to stain." *Id.* As they approached the Cohoes bike path, Dunia was speaking to and texting "Irving," who kept changing the location of the buy, and told Dunia to come alone to meet him. TT at pp. 60-66. Dunia then left his friends. *Id.* Those friends felt that it was taking too long to complete the transaction, so Carpenter called Dunia. *Id.* He picked up, and while they were on the call several shots were heard. *Id.* His friends ran to Dunia, who was down on the ground, shot and bleeding. *Id.* The friends attempted to get assistance. TT at p. 126. When the police arrived, Dunia was dead. TT at p. 188.

**B. Evidence at the Scene – Shell Casings and No Gun**

At the scene of the shooting the police recovered several shell casings on the ground. TT at pp. 227-28, 592-95. The casings were to a .40 caliber Smith & Wesson. *Id.* At trial, Maria Rauche from the State Police Forensic Investigation Center testified that, pursuant to her analysis, all five shell casings were fired from the same gun. TT at pp. 1080-81. Dr. Sikirika, a forensic pathologist, indicated that the autopsy revealed that Dunia sustained three gunshot wounds, with an additional shot being responsible for the severing of the tip of Mr. Dunia's index finger. TT at pp. 714-18, 723. According to Dr. Sikirika, the last shot fired was to Dunia's head. *Id.*

While at the scene, a police K-9 handler and his dog were unable to find the weapon used in the shooting. TT at pp. 335-54. However, the K-9 was able to track footprints that led from the bike path in a southern direction, away from the scene to the Norlite, LLC quarry (the "Norlite Quarry"). TT at pp. 340-44.

**C. Petitioner's Suspected Route Home**

The shooting occurred at approximately 10:00 pm on November 16, 2018. SR at p. 791. The investigation determined that, at approximately 10:07 pm, an infrared trail camera captured a man standing on the Cohoes bike path. TT at p. 372, 470. As noted above, the police dog followed boot tracks from that location to the Norlite Quarry. TT at pp. 340-46. At approximately 10:45 pm, a taxi was in that area with three passengers already on board when the driver was flagged down by an individual who said that he had an argument with his girlfriend and needed a ride to Rite Aid in Watervliet. TT at pp. 428-31. As it turned out, two of the passengers in the cab

recognized Petitioner and identified him at trial. TT at pp. 434, 437-62. The taxicab driver and the passengers described Petitioner's clothing and indicated that he was sweating. TT at pp. 431-32, 441-42.

### D. Derek Maloney

Three nights after the shooting, Petitioner and a friend, Derek Maloney, were drinking together at Petitioner's apartment in Watervliet and discussed the shooting of Dunia. TT at pp. 686-92. Petitioner noted that he "had bad blood" with Dunia, and that he had been robbed by him in the past. *Id.* Maloney also testified that he had seen photos of Petitioner holding a handgun, which he described as silver with a black handle, and Petitioner himself indicated he could get hollow point bullets for it. TT at pp. 696-712. As part of their conversation, Petitioner also advised Maloney that he used the TextNow application which allowed him to mask his cell phone number. TT at pp. 702, 791-92. Finally, Maloney witnessed Petitioner wrap up some Timberland construction boots in garbage bags and dispose of them a few blocks from the apartment. TT at pp. 693-96.

### E. Police Interview with Petitioner and Other Investigative Acts Relative to Petitioner's Phone

The police obtained an arrest and search warrant for Petitioner's person and cell phone and executed those warrants on November 21, 2018. TT at p. 868; SR at p. 50. Petitioner was placed in custody and questioned during the transport, and thereafter at the police station. TT at p. 868; SR at p. 570. In a written statement, the Petitioner acknowledged his cell phone number and his exclusive possession of that phone. TT at

pp. 870-76; SR at pp. 14-16. Petitioner, however, categorically denied any involvement in the shooting of Dunia. SR at p. 16.

With regard to Petitioner's phone, a data analysis showed that the phone had eight location data histories deleted, and the phone was either first powered on, or reset, on November 19, 2018, three days after the shooting. TT at pp. 517-19; SR at pp. 639, 820. It also showed that Petitioner's Snapchat username was "hitsquadbrim." TT at p. 513. The police obtained records that disclosed that, on the day of the shooting, Dunia used his cell phone to exchange dozens of texts with a number ending in 6542. TT at pp. 535-36, 544, 852. This was a TextNow phone number that had been traced to Petitioner. SR at p. 642; TT at pp. 794-800. The texts began at 8:00 am setting up the marijuana purchase, and later on identifying the location of the exchange on the Cohoes bike path, and then at 10:00 pm advising Dunia to come alone, and to a more specific location. TT at pp. 53-66, 852-55. Further, the State Police testified to the cell tower location data, which indicated that both Petitioner's cell phone and Dunia's cell phone were using cell phone towers near each other at the time of the shooting. *People v. Slivienski*, 204 A.D.3d at 1232. After 10:06 pm, Dunia's phone ceased using any cell towers, either because it was powered off or destroyed, and Petitioner's phone moved from the cell tower in Cohoes, and towards towers facing Cohoes and Watervliet. TT at pp. 841-45.

### F. Evidence of Petitioner's Prior Possession and Firing of a Handgun, and the Further Match of Shell Casings

A former friend of Petitioner, Dominic Barbuto, testified at trial regarding Petitioner's ownership and use of a .40 caliber handgun. TT at pp. 738-39, 741-43. He

also testified regarding a time in the spring of 2018 when he, Petitioner, and others traveled to the west side of Lake George at a remote location across from the Depe Dene Motel so that they could fire guns, including the aforesaid .40 caliber handgun. TT at pp. 741-48. A video of the event was created and introduced at trial. Pet. at p. 19. Barbuto also indicated that he observed Petitioner possess that same weapon multiple times. TT at pp. 757-58.

After Dunia's death, New York State Troopers traveled to Lake George and the site identified by Barbuto, and were able to collect twenty-seven .40 caliber Smith & Wesson casings. TT at pp. 1001-09, 1021, 1085-86. The ballistics expert examined the casings together with the ones found at the crime scene and determined that they were all fired by the same gun. TT at pp. 1089-94.

### G. Pretrial Motions and Events

Counsel for the Petitioner filed omnibus motions in the criminal case. First, counsel moved to suppress the statements that the Petitioner provided at the police station on November 21, 2018. SR at p. 47. A hearing was held on the matter, after which the Trial Court denied suppression of the statements, but only permitted the People to play the video of the interview to the point at which Petitioner signed his written statement. SR at pp. 57-58. Next, counsel sought to exclude any evidence that Petitioner owned and fired a loaded handgun at the makeshift shooting range in Lake George, New York. SR at pp. 179, 185-86. Ultimately the Trial Court denied this motion and held that the evidence was admissible under New York law because it demonstrated Petitioner's use and possession of the firearm used in the murder and

therefore did not constitute *Molineux* evidence. SR at pp. 185-86. As part of other defense motions, the Trial Court noted that the search warrants issued in the case were appropriate and were supported by probable cause. SR at p. 59.

Prior to trial, the People requested permission to call a records custodian of the Canadian company TextNow to have him validate the records received as a result of the subpoena that was issued, and further to have that individual testify at trial by remote means. SR at pp. 189-200. The People noted that extensive and diligent efforts were made to obtain that testimony in person but were unsuccessful. *Id.* In particular, there was no custodian of records located within the United States, and pursuant to the applicable treaty with Canada, a witness could not be compelled to give testimony outside of his country. *Id.* In light of that, the People arranged for the custodian of records to testify by video, with sufficient safeguards of testimonial reliability, including testimony under oath, the opportunity for contemporaneous cross-examination, and the opportunity for the judge, jury, and the Petitioner to view the demeanor of the witness as he testifies. SR at p. 195.

Petitioner's counsel objected to the subpoena of the TextNow custodian of records, as well as the testimony of that individual through remote means. SR at pp. 208-21. The Trial Court ultimately permitted the testimony after making a record and issuing factual findings. SR at pp. 294-301. After that testimony was complete, the Trial Court confirmed the effectiveness of the two-way testimony, stating: "Well, here's my observation: It was excellent. The sound was excellent, the visual was excellent, it

had, on all fours, akin to being live testimony in the courtroom. And so to the extent that there's any objection, the objection is overruled." TT at p. 639.

**H. Trial**

The matter proceeded to trial, which began on September 19, 2019 and lasted until September 27, 2019. TT at pp. 1, 1125; SR at pp. 304, 381; Pet. at p. 1. During the week-long trial, the jury heard from over forty witnesses, and received and reviewed over two hundred and fifty exhibits. *See generally* TT. After instructions and hearing extensive closing arguments, the jury convicted Petitioner of Second Degree Murder and Second Degree Criminal Possession of a Weapon. SR at pp. 7, 9-10.

**I. Post Verdict Motions and the Appeal**

After the verdict, Petitioner's counsel filed a CPL 330.30 motion based upon the alleged *Brady* violation with respect to the trial testimony of ballistics expert Maria Rouche. SR at pp. 381-87. At issue was the fact that that witness had been involved in a motor vehicle accident prior to trial that may have affected her memory or cognitive abilities. *Id.* The Trial Court, while recognizing that a *Brady* violation had occurred, nevertheless denied the motion for a new trial, holding that there was no reasonable probability, or even possibility, that the result at trial would have been different with the disclosure of the evidence in question. *Id.*

Petitioner, represented by counsel, appealed the guilty verdict to the Appellate Division, Third Judicial Department, making essentially identical arguments to those presented in this Petition. SR at pp. 559-676. The Appellate Division unanimously affirmed the conviction. *People v. Slivienski*, 204 A.D.3d 1228. Petitioner then sought

leave to appeal to the Court of Appeals, raising all the issues argued before the Appellate Division. SR at pp. 806-27. Leave to appeal was denied on July 21, 2022. *People v. Slivienski*, 38 N.Y.3d 1136.

## II. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Petitioner bears the burden of proving by a preponderance of the evidence that he is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Jones v. Vacco,* 126 F.3d 408, 415 (2d Cir. 1997); *Rivera v. New York*, 2003 WL 22234697, at *3 (S.D.N.Y. Aug. 28, 2003). A federal court may not grant habeas relief to a state prisoner on a claim unless the state court adjudicated the merits of the claim and such adjudication either:

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> 2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Hawkins v. Costello*, 460 F.3d 238, 242 (2d Cir. 2006).

The Second Circuit has summarized the application of the standard of review under AEDPA as follows:

> [u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001) (citing *Williams v. Taylor*, 529 U.S.

362 (2000) and *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000)). The standard of review under § 2254(d) is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010). "[A] state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

The phrase "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of th[e] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412. A state court decision is "contrary to" established Supreme Court precedent "if the state court arrives at a conclusion opposite to that reached by th[e] Court on a question of law or if the state court decides a case differently than th[e] Court has on a set of materially indistinguishable facts." *Id.* at 413. A state court decision is an "unreasonable application" of established Supreme Court precedent "if the state court identifies the correct governing legal principle from th[e] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* AEDPA also requires that "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005); *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d Cir. 2001).

## III. DISCUSSION[4]

### A. Admission of Slivienski's Statements

The Court turns first to Petitioner's claim that the admission of his statements to the police at his criminal trial violated his rights under the United States Constitution. Pet. at p. 20. Five days after the shooting of Dunia, Petitioner was arrested at his place of work and was taken by State Troopers to the New York State Police Station. SR at pp. 14, 470, 482, 635. Petitioner was given his *Miranda* warnings during the car ride to the station and communicated to a limited extent with the officers in the car. TT at pp. 464-70, 479-82. At the police station, however, and after the police began a recorded interview, Petitioner stated "I don't want to talk anymore. I don't want to talk anymore." SR at pp. 635-36. The record indicates that the Petitioner had a particular objection to the arresting officer who, during the arrest, had apparently thrown him into a puddle. TT at pp. 468-69, 479, 483.

Thereafter, Investigator Deluca entered the room and began to question the Petitioner again, including asking Petitioner: "what can you tell us about the rumors that are going around about you?" SR at p. 636. Petitioner then "respond[ed] that people are saying that he killed Dunia." *Id.* The interview then continued. *Id.* At no time after the Petitioner indicated that he did not want to talk was he re-Mirandized. *Id.* Petitioner then provided information by way of a written statement and a video interview. SR at

[4] Respondent argues that certain of Petitioner's claims are procedurally defaulted. Because those claims are considered on the merits below and dismissal is recommended as to each on the merits, Respondent's "procedural default contentions need not be addressed." *Davis v. Powers*, 2010 WL 1704729, at *3 n.4 (N.D.N.Y. Apr. 6, 2010), *report and recommendation adopted*, 2010 WL 1712963 (N.D.N.Y. Apr. 28, 2010).

pp. 14-16 (written statement); *see* SR at pp. 57-58 (discussing videotaped interview). During the questioning Petitioner denied any involvement in the shooting of Dunia. SR at pp. 14-16. Petitioner stated "I had no involvement in the shooting of Johni Dunia and I was no where near the bike path that evening." SR at p. 16; *see* SR at p. 590. Petitioner did indicate that he went to his mother's house to visit his son, described how he was dressed, and indicated his route home and that he flagged down a cab near the Norlite Quarry. SR at pp. 14-16, 589. In addition, during his questioning by police Petitioner provided his cell phone and the passcode and explained that the phone had recently been reset because it was operating slowly. SR at pp. 588-89, 639, 820.

Petitioner's trial counsel timely moved to suppress the statements, SR at pp. 24-32, which were ultimately introduced at trial. *See* TT at pp. 869-71, 875-76 (admitting into evidence at trial Exhibit 187, a three-page written statement, and Exhibit 186, a redacted video). After a *Huntley*/*Dunaway* hearing, Judge Lynch ruled that Petitioner had voluntarily and explicitly waived his *Miranda* rights and did not invoke his right to counsel until the end of the interview at 7:05 pm. SR at pp. 56-58. Accordingly, the Petitioner's written statement was admissible, as well as the audio recording up until the written statement was signed, but the remaining portion of the video, with very limited exceptions, was held by Judge Lynch to be inadmissible as it contained merely accusations by the police that the Petitioner was lying in the face of his consistent protestations of innocence. *Id.*

In considering Petitioner's claim, the Appellate Division disagreed with the Trial Court and concluded that the Petitioner's statements were in fact involuntary. The

Appellate Division noted that if, during a police interrogation, the subject indicates in any manner or at any time that he wishes to remain silent, the interrogation must stop. *People v. Slivienski*, 204 A.D.3d at 1236 (internal quotations and citations omitted). In this case, Petitioner specifically noted when he arrived at the police station that he did not wish to talk anymore, and this request should have been honored. *Id.* Therefore, the Appellate Division concluded that the State Police Investigator violated the Petitioner's rights when he continued to interrogate him for hours without providing him any further *Miranda* warnings and receiving an appropriate waiver. *Id.*

While the Appellate Division agreed with the Petitioner on this point, it nevertheless concluded that:

> [G]iven the overwhelming proof of defendant's guilt, as well as the fact that most, if not all, of defendant's statements to the investigators were exculpatory, there is no reasonable possibility that the error might have contributed to defendant's conviction; thus, we would find that this error was harmless beyond a reasonable doubt.

*Id.*

It is against this backdrop that the Court reviews the Petitioner's constitutional claim. In doing so, the Court accepts, as did the Appellate Division, that the admission of the Petitioner's statements should not have been allowed considering the Petitioner's specific request to stop speaking. *See*, *e.g.*, *Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989) ("Nothing was ambiguous or equivocal about [defendant's] statement that he did not wish to be questioned. He straightforwardly refused to talk at that time. Moreover, [the ADA's] remark that 'If you want to talk to us, now is the time to do it' was not aimed at resolving any ambiguity in [defendant's] statement, but rather at

changing his mind. This is precisely the sort of conduct the prophylactic rule seeks to prevent.") The sole issue, therefore, is whether the admission of the statements was sufficiently prejudicial to necessitate a new trial. The Court does not believe that this standard has been met.

The erroneous admission of a defendant's statements in violation of *Miranda* is subject to harmless-error review. *See Perkins v. Herbert*, 596 F.3d 161, 174 (2d Cir. 2010) (citing cases). In a habeas proceeding such as this, the Court assesses the "prejudicial impact" of admission at trial of the Petitioner's involuntary statements under the "'substantial and injurious effect' standard set forth in *Brecht* [*v. Abrahamson*]." *Wood v. Ercole*, 644 F.3d 83, 93-94 (2d Cir. 2011); *see also Brecht v. Abrahamson*, 507 U.S. 619, 635-37, (1993). To make this determination, "[we consider] the importance of the . . . wrongly admitted [evidence], and the overall strength of the prosecution's case." *Id.* at 94 (quoting *Wray v. Johnson,* 202 F.3d 515, 526 (2d Cir. 2000)) (alterations in original). Courts assess "[t]he importance of wrongly admitted evidence" by considering (1) the "prosecutor's conduct with respect to the evidence," (2) whether the evidence "bore on an issue plainly critical to the jury's decision," and (3) whether the evidence "was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." *Id.* (internal citations, quotation marks, and ellipses omitted). The strength of the prosecution's case without the erroneously admitted evidence "'is probably the single most critical factor in determining whether the error was harmless.'" *Id.* (quoting *Latine v. Mann*, 25 F.3d 1162, 1167-68 (2d Cir. 1994)).

Here, the overwhelming majority of the statements made to the police were exculpatory; in particular, at the time of the shooting, Petitioner maintains that he was visiting his mother and son at his mother's house located near the bike path in Cohoes. SR at pp. 14-16, 589. This assertion was then utilized by Petitioner's counsel to establish an alibi without him having to testify and be subject to cross-examination.

Further, this evidence provided a potentially innocent explanation for the fact that Petitioner's phone was found to be in the area where the shooting occurred based upon cell site tower data and was consistent with the Petitioner's explanation as to why he flagged down a cab near Speedway. *See* TT at p. 1142 ("And if you remember all those maps the DAs showed us. And those bands -- you know, we were told, okay, the device can be anywhere in those bands. Well, what's also in those bands? Tommy's mother's house. She lives at 139 Central Ave. Right there she is in almost every single one of those bands that they attributed to his phone. So isn't it possible that he was just at his mother's house? He told the police he was at his mother's house. But, no, no, we don't believe that, that's not good enough, I don't care. So, ladies and gentlemen, I would ask you to take that cell phone triangulation with a grain of salt."). Other information that was contained in the statement was cumulative of evidence that the police obtained separately, including: Petitioner's ownership of the cellphone in question; the fact that Petitioner's cellphone had been reset shortly after the shooting; the Petitioner's use of the TextNow application; and the fact that Petitioner was in dark clothing and sweaty when he flagged down the taxi. SR at pp. 14-16, 588-89, 639, 642, 820; TT at pp. 431-32, 441-42, 517-19, 702, 791-92, 794-800, 870-76.

The appeals court considered all these factors when it concluded that the admission of the Petitioner's statement was harmless error. In this Court's view, the conclusion of the Appellate Division was a reasonable application of clearly established federal law. The nature of this test, as noted above and recently reiterated by the Supreme Court, is an exacting one, and applies only when the state court decision unreasonably applies federal court precedent in a fashion that "'blunder[s] so badly' that no fair-minded jurist could agree with it." *McCarthy v. Hernandez*, 146 S. Ct. 1873, 1880 (2026) (quoting *Mays v. Hines,* 592 U.S. 385, 392 (2021)). That standard was certainly not met here. Accordingly, this argument by Petitioner in favor of habeas relief is rejected.

**B. Introduction of Petitioner's IP Address**

As explained in the Petitioner's state court brief, shortly after the murder the police were able to determine via decedent Dunia's cell phone records that he had been in communication with 518-286-6542 immediately before the shooting. SR at p. 642. A short time later the police obtained a warrant from Cohoes City Court to the owner of that number, a Canadian corporation called TextNow.[5] *Id*. TextNow enables its

[5] Defense counsel did not immediately object to the warrant as part of the omnibus motion but thereafter did raise various objections in response to the People's request for the remote testimony of the TextNow custodian of records, including the jurisdictional limit of the Cohoes City Court to issue the warrant. The Appellate Division dealt only with the issue of Petitioner's expectation of privacy in the IP address information as, without that, he had no standing to object to a warrant that was voluntarily complied with by a Canadian Company. As to the jurisdictional issue, this Court notes that on March 23, 2018, prior to the warrant in question, Congress enacted and the President signed into law the Clarifying Lawful Overseas Use of Data Act (the "CLOUD Act"). The CLOUD Act amends the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, by adding the following provision: "A [service provider] shall comply with the obligations of this chapter to preserve, backup, or disclose the contents of a wire or electronic communication and any record or other information pertaining to a customer or subscriber within such provider's possession, custody, or control, regardless of whether such communication, record, or other information is located within or outside of the United States." CLOUD Act § 103(a)(1).

customers to use a number temporarily, essentially functioning as a "digital burner phone." *See* TT at pp. 18, 549, 629-30. TextNow responded to the subpoena, indicating that there were two IP addresses that used the number in question at various times during the day and night of the homicide, and they were traced back to the Petitioner. SR at p. 642; TT at pp. 794-800. In particular, the results of the IP log indicated that from 8:55 pm on November 16, 2018, until 10:16 pm on the same day, the IP address was used to access the TextNow service via a Verizon phone number 518-207-5212, which was identified by the police as Petitioner's personal cell phone. SR at p. 204.

The Petitioner objected to this testimony in two ways. First, he argued that the information was obtained in violation of his Fourth Amendment rights and in contravention of his expectation of privacy in his IP address, and the search warrant issued by the Cohoes police court was jurisdictionally defective. *People v. Slivienski*, 204 A.D.3d at 1237-38. Second, the Petitioner, through counsel, objected to the remote trial testimony of the custodian of records for TextNow, a Canadian Corporation. *Id.* at 1240 n.2.

At the time of Petitioner's trial and related appeal, the Second Circuit had held that individuals do not have a reasonable expectation of privacy in IP address information because it is non-content data voluntarily conveyed to third-party service providers. *See United States v. Ulbricht*, 858 F.3d 71, 95-98 (2d Cir. 2017). Because such information is disclosed to third parties for the purpose of facilitating internet communications, law enforcement may obtain it without a warrant. *Id.* In *Ulbricht*, the Court analogized IP address information to pen register data and explained that an IP

address captures addressing and routing information rather than the content of communications and therefore falls squarely within the third-party doctrine. *Id.* By classifying IP address data as routing information, the Court placed it within a category of information that users knowingly expose to third parties in the ordinary course of using the internet. *Id.* Accordingly, the Court concluded that the government's collection of IP address routing information did not constitute a Fourth Amendment search. *Id.*

Although at the relevant time the Supreme Court in *Carpenter v. United States* recognized a limited exception to the third-party doctrine for cell-site location information ("CSLI") due to its detailed, continuous tracking capabilities, 585 U.S. 296 (2018), courts in this and other Circuits had declined to extend that reasoning to IP address data. *See United States v. Hood*, 920 F.3d 87, 92 (1st Cir. 2019); *United States v. Christie*, 624 F.3d 558, 574 (3d Cir. 2010); *Gabrielli v. Insider, Inc.*, 2025 WL 522515, at *4 (S.D.N.Y. Feb. 18, 2025); *United States v. Kidd*, 394 F. Supp. 3d 357 (S.D.N.Y. 2019); *United States v. Zhou*, 2025 WL 218831, at *6-7 (E.D.N.Y. Jan. 16, 2025). In *Carpenter v. United States*, the Supreme Court emphasized that CSLI provides "a detailed chronicle of a person's physical presence" over time, allowing the government to track an individual's movements with near precision. 585 U.S. at 315. Unlike CSLI, which is generated automatically and can provide a detailed and continuous record of a person's physical movements, IP address information is created only when a user actively accesses the internet and does not reveal the same or precise location data. *See id.* at 315; *United States v. Kidd*, 394 F. Supp. 3d at 362-64. Rather

than tracking a user's movements over time, IP address information reflects discrete instances of internet activity and is primarily used to identify and route communications. *United States v. Kidd*, 394 F. Supp. 3d at 362-64.

In *United States v. Kidd*, decided in 2019, the court rejected the argument that IP address data should be treated like CLSI, emphasizing that such information "'show[s] information associated with the defendant's affirmative access and use of the Internet' and, conversely, does not 'show the actual physical location of the user.'" *Id.* at 360 (alteration in original). The court relied on this distinction in declining to extend *Carpenter* and upholding the warrantless acquisition of data, reasoning that the limited and indirect nature of IP address data does not implicate the same privacy concerns associated with continuous location tracking. *Id.* at 363; *see also United States v. Hernandez*, 2020 WL 3257937, at *21 (S.D.N.Y. June 16, 2020) ("[T]he Court finds that Hernandez has not met his burden of showing that he has a reasonable expectation of privacy in the IP address information collected by Kik and obtained by the Government."); *United States v. Zhou*, 2025 WL 218831, at *5 ("Zhou has not established that she had a reasonable expectation of privacy in her IP address records."); *United States v. Grace*, 2026 WL 1021074, at *7 (E.D. Cal. Apr. 15, 2026) (holding that the defendant had no expectation of privacy in their IP address and, as a result, denying motion to suppress TextNow warrant).

At the time relevant to this decision, therefore, IP address information remained non-content, third-party routing data that does not trigger Fourth Amendment protection or require a warrant for law enforcement to obtain. It follows, therefore, that the

admission into evidence of the IP address is not a basis to overturn the Petitioner's conviction.

Furthermore, any challenge to the admissibility of evidence is foreclosed by the Supreme Court's decision in *Stone v. Powell*, 428 U.S. 465 (1976). Pursuant to *Stone v. Powell*, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim," federal habeas corpus relief will not lie for a claim that evidence recovered through an illegal search or seizure was introduced at trial. 428 U.S. at 482. "The *Stone v. Powell* doctrine applies to all Fourth Amendment claims, including claims of illegal stops, arrests, searches, or seizures based on less than probable cause, and it applies regardless of the nature of the evidence sought to be suppressed." *Collier v. Superintendent, Coxsackie Corr. Facility*, 2020 WL 2341062, at *11 (N.D.N.Y. May 11, 2020) (citing *Cardwell v. Taylor*, 461 U.S. 571, 572-73 (1983)). Here, because Petitioner had and utilized the State's procedure to challenge the location information in state court, SR at pp. 642-54, those claims are barred from habeas review. *Ruiz v. Walker*, 2026 WL 467750, at *7 (E.D.N.Y. Feb. 19, 2026).

**C. Confrontation Clause**

Petitioner next contends that TextNow representative Tristan Huntington's virtual testimony violated the Confrontation Clause of the Sixth Amendment and caused "reversible error." Pet. at p. 22. That argument does not withstand scrutiny.

The Supreme Court has stated that "the Confrontation Clause guarantees the defendant a face-to-face meeting with witnesses appearing before a trier of fact." *U.S. v. Gigante*, 166 F.3d 75, 80 (2d Cir. 1999) (quoting *Coy v. Iowa*, 487 U.S. 1012, 1016

(1988)). However, this right is "not absolute," and the Court has made exceptions for one-way video testimony that was "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Maryland v. Craig*, 497 U.S. 836, 850 (1990) (citations omitted) (holding that video testimony was permissible to protect a child victim of sexual abuse from the trauma of testifying in front of her abuser). Further, video testimony does not offend the clause if it "adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony." *Id.* at 851.

Regarding two-way video testimony, the Supreme Court has not ruled directly, but the state court's conclusions are consistent with how existing precedent has been applied. In *U.S. v. Gigante*, the Second Circuit held that "two-way closed-circuit television testimony does not necessarily violate the Sixth Amendment." 166 F.3d at 81. Specifically, "[u]pon a finding of exceptional circumstances, . . . a trial court may allow a witness to testify via two-way closed-circuit television when this furthers the interest of justice." *Id.* Additionally, courts in this Circuit have authorized testimony by two-way video when: "(1) the witness's testimony is material; (2) the Government has made good-faith and reasonable efforts to obtain the witness's presence and is unable to do so . . . [;] and (3) allowing testimony by such means furthers the interests of justice." *U.S. v. Donziger*, 2020 WL 5152162, at *2 (S.D.N.Y. Aug. 31, 2020).

Moreover, the Second Circuit has recognized "exceptional circumstances" under *Gigante* and permitted two-way video testimony where a witness is beyond the court's subpoena power. *U.S. v. Won*, 2024 WL 827774, at *2 (2d Cir. Feb. 28, 2024) (holding

that exceptional circumstances existed where "both witnesses were beyond the court's subpoena power and represented that they would not testify in person."). Petitioner states that "the [Respondent] identified no unusual circumstance preventing Huntington from making the trip to New York . . . other than the unwillingness," and that video testimony is permitted only upon a finding of "exceptional circumstances." Pet. at p. 22. However, as Respondent notes, TextNow is a Canadian corporation, and while it voluntarily produced business records for trial, it refused to send a custodian to testify in-person and the Mutual Legal Assistance Treaty does not allow the court to compel a witness to travel outside his or her home country. Resp.'s Mem. of Law at p. 63. Notably, Petitioner also acknowledged in his Petition that TextNow is "a Canadian Corporation without employees or representatives in the U.S.," as well as the court's inability to compel TextNow's physical appearance at trial. Pet. at p. 22.

For the purposes of this Petition, "an unreasonable application of federal law occurs when a 'state court identifies the correct governing legal principle . . . but unreasonably applies it to the facts of [a petitioner's] case.'" *Krivoi v. Chappius*, 2022 WL 17481816, at *1 (2d Cir. Dec. 7, 2022) (quoting *Williams v. Taylor*, 529 U.S. at 407) (alteration in original). Federal law specifically "refers to the holdings, as opposed to the dicta, of th[e] [Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412. Under *Carey v. Musladin*, "[i]f there are no Supreme Court holdings that squarely address a petitioner's claim, 'it cannot be said that the state court unreasonably applied clearly established Federal law.'" *Krivoi v. Chappius*, 2022 WL 17481816, at *1 (quoting *Carey v. Musladin*, 549 U.S.

70, 77 (2006)). A "habeas court may not use Second Circuit precedents to 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule' that the Supreme Court 'has not announced.'" *Green-Faulkner v. Lowerre*, 2024 WL 1769316, at *5 (E.D.N.Y. Apr. 24, 2024) (quoting *Jackson v. Conway*, 763 F.3d 115, 134 (2d Cir. 2014)). That, however, does not mean that "Circuit precedent is irrelevant in deciding that the state court's decision was not such an 'unreasonable application.'" *Jones v. Murphy*, 694 F.3d 225, 242 n.9 (2d Cir. 2012).

Therefore, since the Supreme Court has not addressed the permissibility of two-way video testimony, and the state court's conclusion was not an unreasonable application of existing Supreme Court Confrontation Clause precedent, habeas relief is not available as to this claim.

**D. Introduction of Petitioner's Alleged Prior Possession and Use of the Murder Weapon, and His Snapchat Username**

Petitioner has raised objections to admission of evidence of his possession of the .40 caliber gun believed to be the weapon used in the Cohoes shooting. Pet. at pp. 19-20. That evidence was submitted at trial in several forms. First, there was first-hand testimony by Barbuto, Petitioner's friend, regarding their travel to Lake George to a piece of property located across from the Depe Dene Motel. *See generally* TT at pp. 737-67. There was also admission of a video which showed Petitioner with the weapon at that makeshift shooting range. Pet. at p. 19. Testimony was also received from Petitioners acquaintance, Darek Maloney, that he saw photos of Petitioner with what

looked like a silver and black handgun, and Petitioner had told him that he used hollow point ammunition. TT at pp. 696-700.

New York law generally prohibits the introduction of evidence of prior *uncharged* crimes or bad acts to prove a defendant's criminal propensity or to show that a defendant acted in conformity with that behavior. *People v. Molineux*, 168 N.Y. 264 (1901). However, where evidence of another bad act is relevant to a material aspect of the case other than the defendant's propensity to commit the crimes charged, it should not be categorically excluded solely because it demonstrates that the defendant committed other crimes. *See People v. Israel*, 26 N.Y.3d 236, 242 (2015). Such evidence may be admitted to establish: "(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial." *People v. Molineux*, 168 N.Y. at 293.

As a threshold matter, Petitioner's claim that the Trial Court erroneously admitted bad acts evidence "is not cognizable on federal habeas review." *Kamp v. Shanley*, 2019 WL 6894849, at *6 (N.D.N.Y. Dec. 18, 2019) ("To the extent that [petitioner] contends that the trial court's ruling was contrary to *Molineux*, such claim presents solely an issue of state law that is not cognizable on federal habeas review.").

Assuming, *arguendo*, that this claim was properly presented in constitutional terms, it would be without merit because the Trial Court properly admitted the evidence. As ultimately concluded by Judge Lynch, the evidence that Petitioner actually possessed

the weapon that was believed to be used in the murder was not *Molineux* evidence at all because it was not part of a prior bad act, but in fact was proof regarding Petitioner's alleged illegal possession of a handgun that was in use in the murder. SR at pp. 185-86. Accordingly, admission of the evidence did not violate federal or state law, and the Appellate Division's decision in this regard is not erroneous. *See United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (noting that possession of a particular gun at issue on another date did not violate Federal Rule of Evidence 404(b)).

Finally, Petitioner argues that the admission of his Snapchat username "hitsquadbrim" on multiple occasions was prejudicial to him and denied him his right to a fair trial. Pet. at pp. 17, 20. However, no objection to the admission of this evidence was made at trial, and therefore this claim was not preserved. Further, even if it had been, Petitioner has not established a proper basis for relief primarily for the arguments presented by Respondent in their brief. Resp.'s Mem. of Law at pp. 35-37. As noted therein, the case was about establishing the shooter's identity, and the Snapchat account was relevant as it contained photos of Petitioner with the suspected murder weapon. Further, references to the Snapchat username were kept to a minimum and were done primarily to distinguish the Snapchat account from others that the Petitioner possessed. *United States v. Price*, 443 F. App'x 576, 579 (2d Cir. 2011) (holding that occasional use of nickname "crime" was permissible). The limited use of the Petitioner's Snapchat name did not deprive the Petitioner of fundamental fairness.

## E. *Brady v. Maryland* Violation

A significant part of Petitioner's trial related to forensic evidence of shell casings found at the scene as well as other locations that were associated with the Petitioner. In particular, state police investigators found five spent shell casings with a .40 caliber Smith & Wesson head stand at the Cohoes murder scene. TT at p. 218, 224-28, 245-49. Maria Rauche, a firearm tool market examiner, testified that the casings found at the Cohoes murder scene were fired from the same weapon. TT at pp. 1075-81.

The autopsy by Dr. Sikirica noted that the victim, Dunia, had sustained at least three gunshot wounds: one in the left arm that went through the heart muscle; one to his right thigh; and one in the top of his head. TT at pp. 716-20. A partially severed finger and the victim was consistent with the fourth gunshot wound. *Id.*

Barbuto, a former friend of the Petitioner, testified that the Petitioner possessed a .40 caliber handgun. TT at pp. 738-39, 741-43. He noted that he had seen that gun at the Petitioner's residence on several occasions, *id.*, and was aware that it used hollow point tips. TT at p. 746. He noted further that on one occasion, in 2018, Petitioner and himself travel to a property located in the Lake George region, across from the Depe Dene Motel, and that together they fired multiple rounds from the .40 caliber pistol, which Barbuto testified was gray in color with a black handle. TT at pp. 741-748. As part of that event, a video of the target shooting was made, and that video subsequently played to the jury. TT at pp. 751-55.

After receiving this information from Barbuto, police investigators went back to the property in Lake George where the target practice took place and recovered twenty-

seven .40 caliber shell casings. TT at pp. 1000-28. The retained ballistics expert, Dr. Rauche, then compared those casings that were obtained in Lake George with the ones recovered from the shooting of Dunia in Cohoes, and after analysis determined that they were fired from the same gun. TT at pp. 1032-1111. Dr. Rauche testified about her analysis, and the reports that she prepared, and her trial testimony was consistent throughout as well as with her prior grand jury testimony. *Id.*

After the conclusion of the Petitioner's trial, and after the guilty verdict had been delivered, the prosecution disclosed that the ballistic expert, Dr. Rauche, had been in a car accident on July 31, 2019, and as a result of the injuries she received at that time she had both vision and memory problems that existed at trial. SR at pp. 321-22. Based upon this disclosure, the Petitioner's counsel filed an immediate motion to set aside the verdict for an alleged violation of the dictates of *Brady v. Maryland*. SR at pp. 381-82.

The Trial Court considered and denied the motion. SR at pp. 381-87. The Trial Court noted that the expert had completed her analysis long prior to trial, SR at p. 382. The People also noted that Dr. Rauche's last report was generated on February 6, 2019, more than five months before her automobile accident. SR at p. 321. Further, the trial testimony of the expert was entirely consistent with her pretrial reports and grand jury testimony. SR at p. 382. The Petitioner could show no inconsistency, and accordingly, no substantial prejudice. While the car accident and subsequent effects would no doubt have been brought up during cross-examination, there was no showing that the result would have been any different considering the pre-accident evidence. SR at pp. 386-87. On appeal, the Appellate Division, Third Department adopted this analysis. *People*

*v. Slivienski*, 204 A.D.3d at 1239. As the information with regard to the automobile accident would not have materially changed the outcome of the trial, the Petitioner's *Brady* argument was rejected. *Id.*

*Brady* held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "To demonstrate a *Brady* violation, a petitioner must show that: (1) the evidence was favorable to the accused; (2) the evidence was suppressed by the prosecutor; and (3) prejudice resulted." *Parker v. Smith*, 858 F. Supp. 2d 229, 237 (N.D.N.Y. 2012) (citing, *inter alia*, *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).

Petitioner has failed to establish these elements, or to show that the Appellate Division's decision was an unreasonable application of existing federal law. For these reasons, Petitioner's *Brady v. Maryland* claim should be denied on the merits.

**F. Sufficiency of Evidence**

Petitioner asserts that the verdict "was not supported by legally sufficient evidence and was against the weight of the evidence, requiring reversal of the judgement and dismissal of the indictment." Pet. at pp. 17-18. In seeking habeas relief based on alleged insufficiency of the evidence, a petitioner "bears a 'very heavy burden.'" *Torres v. O'Meara*, 353 F. Supp. 3d 180, 188 (N.D.N.Y. 2019) (quoting *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000)). The standard of review for a legal sufficiency claim is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Hogan v. West*, 448 F. Supp. 2d 496, 512 (W.D.N.Y. 2006) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original). Therefore, a habeas court may only overturn a conviction if, based upon the evidence presented at trial, "*no* rational trier of fact could have found that the prosecution established the defendant's guilt beyond a reasonable doubt." *Id.* (citations omitted) (emphasis in original).

Additionally, "[w]hile arguments as to the legal sufficiency of evidence are cognizable in federal court under habeas corpus review, 'weight of the evidence' arguments are founded in New York Criminal Procedure Law § 470.15(5), and thus are not cognizable." *Gethers v. Superintendent*, 2021 WL 7161870, at *2 (N.D.N.Y. Aug. 17, 2021), *report and recommendation adopted*, 2022 WL 122778 (N.D.N.Y. Jan. 13, 2022) (quotation and citations omitted). "[A] weight of the evidence claim is exclusively a matter of state law and therefore presents no federal question reviewable by a federal habeas court." *Lopez v. Superintendent of Five Points Corr. Facility*, 2015 WL 1300030, at *12 (S.D.N.Y. Mar. 23, 2015) (citing, *inter alia*, *McKinnon v. Superintendent, Great Meadow Corr. Facility*, 422 F. App'x 69, 75 (2d Cir. 2011)). Petitioner's weight of the evidence claim therefore should be dismissed as non-cognizable.

As to the constitutional claim, courts defer to the jury's assessment as to credibility and conflicting testimony. *Parisi v. Burge*, 2007 WL 496463, at *1 (N.D.N.Y. Feb. 12, 2007). Here, the jury's findings do not fall below that "threshold of

bare rationality" to render the verdict legally insufficient. *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

A sufficiency of the evidence claim analyzes the evidence in the light most favorable to the prosecution. *United States v. Johnson*, 762 F. App'x 21, 22 (2d Cir. 2019). In initially rejecting Petitioner's weight of the evidence claim, the Appellate Division correctly noted that the case was wholly regarding the identity of the shooter and that, while there was no eyewitness, there was nevertheless voluminous circumstantial evidence. *People v. Slivienski*, 204 A.D.3d at 1230. This included: connecting Petitioner's IP address with the TextNow application used to arrange the drug deal; the cell site locations of Petitioner's phone near the scene of the crime at the time of the murder; that Petitioner left or fled the scene after the shooting; a trail camera video showing an individual fleeing along the suspected escape route; testimony and photographs of Petitioner with a weapon prior to the Cohoes shooting; testimony that the victim and his friends intended to rob the dealer and had done so in the past; that the Petitioner reset his phone, thereby wiping it of its memory within days of the shooting; as well as the testimony of the ballistics expert. *Id.* at 1229, 1231-34.

While the Petitioner takes issue with the methodology of expert Rouche and whether the shooter would have time to travel to the area of the trail camera, Pet. at p. 18, the test is not whether a jury could logically reach different verdicts, but whether this jury's decision falls below the "bare rationality" threshold In this Court's view, a jury, drawing all inferences in favor of the prosecution, could have reasonably

concluded that the Petitioner possessed the handgun and shot Dunia. Accordingly, Petitioner's argument regarding insufficiency of the evidence is not meritorious.

### G. Ineffective Assistance of Counsel

Finally, Petitioner contends that his trial counsel was constitutionally ineffective due to alleged evidentiary errors. Pet. at pp. 19-20. These include the failure to object to the admission of the Petitioner's Snapchat username and to request a limiting instruction regarding the prior use and possession of a handgun. *Id.*

"To establish ineffective assistance of counsel 'a defendant must show both deficient performance by counsel and prejudice.'" *Premo v. Moore*, 562 U.S. 115, 121 (2011) (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009)). Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland v. Washington*, 466 U.S. at 689). A person challenging a conviction thus must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. at 687. Establishing prejudice requires Petitioner to show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

The *Strickland* test imposes a "high bar." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). Under the AEDPA, "it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly." *Bell v. Cone*, 535 U.S. 685, 699 (2002) (citing *Williams v. Taylor*, 529 U.S. at 411). "Rather, [Petitioner] must show that the [state court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Id.*

Moreover, "*Strickland* specifically held that a criminal defendant alleging prejudice must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Morales v. Greiner*, 273 F. Supp. 2d 236, 249 (E.D.N.Y. 2003) (quoting *Strickland v. Washington*, 466 U.S. at 687); *see also Nix v. Whiteside*, 475 U.S. 157, 184 (1986) (Blackmun, J., concurring) ("The touchstone of a claim of prejudice is an allegation that counsel's behavior did something to deprive the defendant of a fair trial, a trial whose result is reliable.") (internal quotation omitted).

In analyzing the ineffective assistance argument, the Appellate Division concluded as follows:

> Finally, defendant's assertion that he was deprived of the effective assistance of counsel based on a few alleged errors is without merit because, even if we were to agree that these failings were "errors," we do not find them to be "so grievous as to amount to a deprivation of the constitutional right to a fair trial." "Viewing the overall record, we find that counsel provided a vigorous and cogent trial strategy, albeit one ultimately not credited by the jury, . . . made appropriate pretrial motions, and effectively cross-examined witnesses and challenged the scope of the evidence admitted, thereby providing defendant with meaningful representation."

*People v. Slivienski*, 204 A.D.3d at 1240 (quotations omitted).

After a review of the complete record, including all pretrial conduct; the trial; the theory of the defense; the strength of the openings, direct and cross examinations, and closings; the post-trial conduct, and the overall zealousness of the representation, the Court once again concurs with the findings of the Appellate Division. For these reasons, Petitioner's claim for relief based on alleged ineffective assistance of counsel should be denied.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that the Petition be **DENIED** and **DISMISSED**; and it is further

**RECOMMENDED**, that no Certificate of Appealability be issued because Petitioner has failed to make "a substantial showing of the denial of a constitutional right" as required by 28 U.S.C. § 2253(c)(2);[6] and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such obligations shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v.*

[6] *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003); *see also Richardson v. Greene*, 497 F.3d 212, 217 (2d Cir. 2007) (holding that, if the court denies a habeas petition on procedural grounds, "the certificate of appealability must show that jurists of reason would find debatable two issues: (1) that the district court was correct in its procedural ruling, *and* (2) that the applicant has established a valid constitutional violation").

*Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs*., 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

Dated: September 1, 2026
Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge